IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

THOMAS F. LANTRY,

                      Plaintiff,

v.

PITNEY BOWES INC., *et al.*,

                      Defendants.

Action No. 08:08–CV–1273—AW

## MEMORANDUM OPINION

Pending before the Court is Defendants Pitney Bowes Inc. ("PBI"), Pitney Bowes Government Solutions, Inc. ("PBGS") and Pitney Bowes Management Services, Inc.'s ("PBMS") (collectively "Pitney Bowes") Partial Motion for Summary Judgment. (Doc. No. 39). The Parties have fully briefed the pending motion, and the Court deems that no hearing is necessary. For the reasons stated herein, Pitney Bowes' Partial Motion for Summary Judgment is **GRANTED-in-PART and DENIED-in-PART**.

        **I.**        **FACTUAL AND PROCEDURAL BACKGROUND**

PBGS, a wholly owned subsidiary of PBI, is a service company that provides mailstream solutions to federal agencies. In October 2003, PBGS acquired DDD Company ("DDD"), a Maryland company where Plaintiff previously was employed. PBGS reported to PBMS, also a wholly owned subsidiary of PBI. After the merger of PBGS and DDD, Plaintiff signed a Retention and Non-Competition Agreement ("the Agreement") with PBGS on October 23, 2003.

Under the terms of the Agreement, Plaintiff is eligible for a retention bonus of up to $1,000,000.00. The first $500,000.00 bonus was to be paid upon the completion of the

1

knowledge transfer. To earn the remaining $500,000.00, Plaintiff would have to help PBGS to (1) attain a defined revenue target of 90% and (2) retain 90% of ten specific recompeted contracts identified in Attachment A to the Agreement. Plaintiff could also earn a commission of 1% on new contracts and 0.5% on recompeted contracts. The Agreement has a merger clause which specified that "any prior agreements (whether written or oral), understandings, statements or representations that may have been made heretofore regarding the terms and matters dealt with in this Retention Agreement are superseded and void and have no effect and that neither party has relied thereon," and that "[n]o waiver, modification or amendment of any provision of the Retention Agreement or any covenant, conditions, or limitation herein contained is valid unless in writing and duly executed by the parties hereto." (Doc. No. 39, Ex. 3 ¶¶ 10, 11).

Before the Agreement was signed, Plaintiff notified Pitney Bowes that a contract with the Patent and Trademark Office ("PTO"), one of the ten contracts listed in Attachment A, could no longer be renewed. (*See* Compl. ¶ 19). Plaintiff learned that the PTO decided to award 100% of the next contract to an exempt 8A company; neither Pitney Bowes nor PBGS qualified as an 8A exempt company. *Id.* Plaintiff asked Pitney Bowes to strike the PTO contract from Attachment A or replace it with a comparable government contract that could be recompeted. (*See* Compl. ¶ 20).

According to Plaintiff, Karen Garrison, then the Executive Vice President and Group President of PBMS, agreed to Plaintiff's request to strike the PTO contract from Attachment A or to replace it with a substitute contract. (*See* Compl. ¶ 21). Relying on Garrison's representation, Plaintiff signed the Agreement. *Id.* The PTO contract, however, remained in the Agreement. Garrison, however, did not recall having this discussion with Plaintiff. (*See* Doc. No. 40, Ex. E at 24). Garrison also denies that she thought the PTO contract was no longer possible

to be recompeted. *Id.* In an email dated October 28, 2003, another Pitney Bowes employee, Donald Dilks, informed Garrison that "we may save all or part of [the PTO contract] given our long standing performance excellence and the weakness of the new 8a partner they have selected." (Doc. No. 40, Ex. C). The Agreement expired on October 22, 2005.

On October 26, 2005, Pitney Bowes informed Plaintiff in an email dated that he did not meet either of the conditions for the $500,000.00 bonus. (*See* Doc. No. 1, Ex. 3). While Pitney Bowes does not dispute that Plaintiff achieved the defined revenue target of 90%, it claims that Plaintiff nonetheless failed to retain 90% of the ten specific contracts in Attachment A. (*See* Doc. No. 39, at 5). On the contrary, Plaintiff asserts that he qualifies for the bonus because he had met the requirement of securing renewal of at least 90% of the contracts listed on Attachment A, if the PTO contract is excluded from the calculation. (*See* Compl. ¶ 23).

In addition to the retention bonus, Plaintiff also contends that Pitney Bowes had failed to pay him the full value of the commission bonuses he had earned for contracts recompeted and renewed. (*See* Compl. ¶ 26). Plaintiff claims commissions for four contracts were not properly paid, that Pitney Bowes miscalculated the payment for one contract, and they failed to pay any commissions for the other three because Plaintiff was allegedly not "materially involved" with those contracts. (*See* Doc. No. 40, at 3).

Plaintiff brought this action against Pitney Bowes on May 15, 2008, for breach of contract (Count I), unjust enrichment (Count II), promissory estoppel (Count III), intentional misrepresentations (Count IV), negligent misrepresentations (Count V), tortious interference with prospective economic advantage (Count VI) and violation of Maryland Wage Payment and Collection Law ("MWPCL") (Count VII). Pitney Bowes has filed a Partial Motion for Summary Judgment, which is pending before this Court. (Doc. No. 39). In their Motion, Defendants seek

summary judgment on Counts II-VII of the plaintiff's Complaint.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must provide evidence that shows a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp. Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III. ANALYSIS

### A. Maryland Wage Payment and Collection Law ("MWPCL")

Defendant avers that Plaintiff cannot pursue a claim under the MWPCL because of their Agreement's explicit choice of law provision giving effect to Connecticut law without regard to conflict of laws principles. Maryland courts have long held that contracting parties can "specify in their contract that the laws of a particular State will apply in any dispute over the validity,

construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court." *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007). However, choice of law provision will not be enforced when: (1) the chosen state has no substantial relationship to the parties or the transaction, or (2) application of the law of the chosen state would violate a strong Maryland public policy. *See Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994). Plaintiff challenges the enforceability of the choice of law provisions under both exceptions.

First, Plaintiff claims that because Maryland has "a materially greater interest in the parties and the nexus for the events relevant to Plaintiff's claim," this Court should not enforce the choice of law provision. (*See* Doc. No. 40, at 7). However, the test Maryland courts have adopted is not which state has the greatest interest in the disputed matter. *See Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (Md. 1995) ("Maryland courts have never applied the 'most significant relationship' test."). Rather, the question is whether the chosen state has a "substantial relationship to the parties or the transaction." *Id.* Since Plaintiff has not alleged that Pitney Bowes has no substantial relationship to the Parties or the Agreement, this exception does not apply.

Second, Plaintiff argues that MWPCL is a sufficient expression of Maryland state public policy to trump the choice of law provision. However, courts in this jurisdiction have repeatedly held that MWPCL does not reflect a fundamental public policy of Maryland. *See, e.g.*, *Taylor v. Lotus Dev. Corp.*, 906 F. Supp. 290, 297 (D. Md. 1995); *Sedghi v. Patchlink Corp.*, 2010 WL 3895472 (D. Md. Sept. 30, 2010); *Yeibyo v. E-Park of DC, Inc.*, 2008 WL 182502 *5-6 (D. Md. Jan. 18, 2008). Plaintiff claims that *Medex v. McCahe*, 811 A.2d 297 (Md. 2002), has overruled *Taylor* and established the MWPCL to be an expression of state public policy. However, as the

5

Court determined in *Sedghi*, "*Medex* is not, of course, directly on point here because the Court of Appeals was considering only whether the provision of a Maryland contract violated Maryland public policy, not whether the MWCPL incorporates a strong public policy, as is required in the conflict of law analysis." *Sedghi*, 2010 WL 3895472 at *4. Therefore, the public policy exception does not apply to this case.

Since the choice of law provision is enforceable under Maryland law, Plaintiff's claim under MWCPL is precluded. The Court will therefore **GRANT** summary judgment to Defendants on Count VII, and apply Connecticut law to the remainder of Plaintiff's contractual claims.

### B. Unjust Enrichment and Promissory Estoppel

Defendants claim that they are entitled to summary judgment because the plaintiff has impermissibly recast his breach of contract claims as claims for unjust enrichment and promissory estoppel. "The purpose of the unjust enrichment doctrine is to supply a remedy where no remedy exists under the contract, not to provide two bites at the apple." *Alliance Group Servs. Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 166 (D. Conn. 2005). Therefore, "[p]roof of a contract enforceable at law precludes the equitable remedy of unjust enrichment." *Feng v. Dart Hill Realty, Inc.*, 601 A.2d 547, 548 (Conn. App. Ct. 1992). Similarly, the purpose of the promissory estoppel doctrine is to provide a remedy when the underlying agreement is unenforceable or a written contract does not exist. *See Alliance Group Servs. Inc.*, 406 F. Supp. 2d at 168. "The promissory estoppel claim is superfluous and inappropriate where the underlying relationship is controlled by an undisputedly enforceable agreement." *Id.* at 169.

In the present case, it is undisputed that the underlying contract is both valid and enforceable. In the Complaint, Plaintiff never once alleged that his Agreement with PBGS is

invalid or unenforceable. In fact, Counts I, II and III of this lawsuit are premised on the assumption that a valid contract exists and ought to be enforced. On the claim of breach of contract, Plaintiff alleges that Pitney Bowes failed to properly compensate him in violation of the contractual terms within the Agreement. (*See* Compl. ¶¶ 27-34). Similarly, Plaintiff is seeking relief under the claims of unjust enrichment and promissory estoppel based on contractual terms from the Agreement. (*See id.* at ¶¶ 35-45).

Moreover, Plaintiff readily acknowledges that his claims of unjust enrichment and promissory estoppel are equivalent to the claim for breach of contract. (*See* Doc. No. 40, at 11). Therefore, Plaintiff "can redress any harm it suffered due to any failure of [Defendants] to conform to the underlying agreement by maintaining its breach of contract [claim]," especially when "an undisputedly enforceable agreement" exists. *Alliance Group Servs. Inc.*, 406 F. Supp. 2d at 168. Accordingly, the Court will **GRANT** summary judgment to Defendants on Counts II and III.

### C. Intentional Misrepresentation, Negligent Misrepresentation and Tortuous Interference with Prospective Economic Advantage

Pitney Bowes contends that the Court should grant summary judgment to Counts IV, V and VI because they are time-barred under Maryland law.[1] The statue of limitations for civil actions in Maryland is three years. The clock begins to run when a plaintiff has the "knowledge of circumstances which would cause a reasonable person to undertake an investigation which, if pursued with reasonable diligence, would have lead to knowledge of the alleged [tort]." *O'Hara v. Kovens*, 503 A.2d at 1313, 1324 (Md. 1986). "[O]nce on notice of one cause of action, a

---

[1] The parties have not fully briefed the issue of which state's law should apply to Plaintiff's tort claims for International Misrepresentation, Negligent Misrepresentation, and Tortious Interference with Prospective Economic Advantage. Defendants reply to the Plaintiff's assertion that Maryland law should apply to these claims by assuming *arguendo* that Maryland law should be applied to these torts. Defendants , however, do not provide any significant argument that Maryland law should not apply to Plaintiff's tort claims. Accordingly, the Court will assess Plaintiff's claims under Maryland law.

7

potential plaintiff is charged with responsibility for investigation, within the limitations period, all potential claims . . . . with regard to the injury." *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 645. (Md. Ct. Spec. App. 1997). If a plaintiff fails to investigate the alleged wrongdoings, the Court cannot "look to any of Defendants' actions occurring more than three years prior to the filing of this case." *Abbott v. Gordon*, 2009 WL 2426052 *7 (D. Md. Aug. 6, 2009).

Plaintiff filed the instant action on May 15, 2008. For Counts IV, V and VI, the central allegation revolves around the failure of Pitney Bowes to uphold a promise allegedly made by Garrison in 2003 regarding the PTO contract prior to the Parties signing the Agreement. Pitney Bowes contends that Plaintiff should have been on notice when this alleged incident took place, and he failed to timely seek judicial relief for his claims by filing this action five years after the alleged tort occured. Moreover, Pitney Bowes points to a letter dated January 28, 2005 written by Plaintiff; in the letter, he complained that he did not receive a bonus in 2003 and 2004 for a number of contracts he qualified. (*See* Doc. No. 39, Ex. 4.) Therefore, Pitney Bowes argues that Plaintiff was at least aware of a potential dispute regarding the commissions and bonus payments more than three years before he finally filed the present lawsuit. Plaintiff instead claims that the wrongs were actually committed on January 15, 2006 when Pitney Bowes failed to properly compensate Plaintiff for all commissions and bonuses due on that day according to the Agreement. A genuine dispute of material fact exists as to when Plaintiff had sufficient knowledge of circumstances that would cause a reasonable person to undertake an investigation on the alleged wrongdoings.

On one hand, a reasonable jury could agree with Pitney Bowes that Plaintiff should have been on notice when he signed the Agreement in 2003. The failure for Pitney Bowes to incorporate Garrison's promise into the Agreement seems enough for a reasonable person to

8

become suspicious and mount an investigation which could have uncovered the alleged torts presented here. The letter dated January 28, 2005 could also serve as evidence for a jury to conclude that Plaintiff was in fact aware of Pitney Bowes' alleged wrongdoings regarding his compensation more than three years before he finally filed these claims. *See id.*

On the other hand, a jury could also make the determination that Plaintiff was reasonable to rely on the words of Garrison regarding the PTO contract. After all, Garrison was a high-ranking executive for Pitney Bowes at the time. In addition, the letter dated January 28, 2005 from Plaintiff did not mention anything related to Garrison's promise. *Id.* Rather, it is arguable that the email dated October 26, 2005 seems to be the first time that Pitney Bowes officially informed Plaintiff that Garrison's alleged promise would not count because it was never included in the Agreement signed in 2003. (*See* Doc. No. 1, Ex. 3). A jury could conclude that before receiving that email, Plaintiff had yet to possess enough information which would cause reasonable person to investigate for possible wrongdoings at that time.

Since there is a genuine dispute of material fact as to when the plaintiff should have discovered the alleged torts, the Court will DENY summary judgment on Counts IV, V, and VI.

### D. Modification of the Agreement

Pitney Bowes asks the Court to rule as a matter of law that the Agreement cannot be modified to exclude the PTO contract from Attachment A as Plaintiff wishes to do. Pitney Bowes points to the merger clause of the Agreement which specified that any modification to the Agreement had to be in writing. (*See* Doc. No. 39, Ex. 3 ¶¶ 10, 11). Plaintiff, while acknowledging the validity of the merger clause, contends that the Agreement can still be modified because a mutual mistake of fact was made when Parties signed the Agreement in 2003.

9

Connecticut law allows for reformation of a contract that does not reflect the real intentions of parties as result of mutual mistake. *See Greenwich Contracting Co. v. Bonwit Constr. Co.*, 239 A.2d 519, 521 (Conn. 1968). Mutual mistake happens when "both parties were mutually mistaken about the same fact." *Dainty Rubbish Serv., Inc. v. Beacon Hill Ass'n, Inc.*, 630 A.2d 115, 119 (Conn. App. Ct. 1993). Therefore, the issue here is whether or not a reasonable jury can find that Parties made a mutual mistake when the Agreement was signed in 2003.

It is undisputed that the PTO contract was already assigned to another company before Plaintiff and Pitney Bowes signed the final Agreement with the PTO contract included in Attachment A. (*See* Doc. No. 40, Ex. C). Garrison also admits that any contract listed in Attachment A would still be possible to be recompeted and Parties' intention was to create a list of contracts that could be recompeted. (*See* Doc. No. 40, Ex. E at 4-7). However, both sides disagree as to whether or not PTO was still possible to be recompeted at the time.

Plaintiff claims that he warned Garrison before signing the Agreement about the PTO contract already being assigned to another company and Garrison agreed to replace it with another contract. (*See* Doc. No. 40, Ex. B at 128-134). Therefore, Plaintiff argues that leaving the PTO contract in the Agreement was a mutual mistake as neither side wanted to have the PTO contract in the Agreement. Pitney Bowes, on the other hand, claims that it never believed the PTO contract was impossible to be recompeted, even after it has been assigned to another company. Garrison testifies that Pitney Bowes could still be chosen as a subcontractor or a joint partner for the PTO contract. (*See* Doc. No. 41, Ex. 3 at 4). Also, in an email dated October 28, 2003, another Pitney Bowes employee stated to Garrison that "we may save all or part of [the PTO contract] given our long standing performance excellence and the weakness of the new 8a

10

partner they have selected." (Doc. No. 40, Ex. C). In addition, Garrison in her deposition testimony raises the question as to why Plaintiff did not "have [the PTO contract] taken out or have a note [in the Agreement] to the effect that it was in jeopardy." (Doc. No. 41, Ex. 3 at 8).

Whether the PTO contract was possible to be recompeted remains unclear, and a genuine dispute of fact exists on this issue. As a result, there is a genuine dispute as to whether Parties had made a mutual mistake in including the PTO contract in the Agreement. Summary judgment is therefore inappropriate on the issue of whether the contract in dispute can be modified.

### E. Commissions on the Department of Justice ("DOJ") and National Institutes of Health ("NIH") Contracts

Pitney Bowes also asks the Court to foreclose Plaintiff from seeking commissions on the DOJ and NIH contracts because Plaintiff has not provided any evidence that he was materially involved in winning these contracts.

Plaintiff seeks over $111,000 in commissions on DOJ and NIH contracts, claiming that Pitney Bowes used the original proposals he had drafted to obtain them. (*See* Doc. No. 39, Ex. 6). In order to earn commission payments, Plaintiff must show that he was materially involved in winning the contract. Plaintiff claims that he was involved because Pitney Bowes used proposals he had originally drafted to win those contracts, and he can identify individuals who can corroborate his testimony. (*See* Doc. No. 40, Ex. B at 18-19, 174-175). Plaintiff further argues that since the Agreement did not specify a definition for "material involvement," a jury should decide whether Plaintiff's involvement in winning these two contracts was "material" and commissions should be awarded based on the available evidence.

However, as Pitney Bowes correctly points out, aside from his own words, Plaintiff has not produced any other admissible evidence such as his draft proposals that Pitney Bowes allegedly used or affidavits from the list of people Plaintiff has identified to corroborate his

testimony that he was materially involved in winning these contracts. In fact, Plaintiff admitted that he "did not have any contact with anyone regarding the DOJ or NIH contracts." (*See* Doc. No. 39, Ex. 9 at 4). To create a genuine dispute of material fact, a party cannot just base its claim on "mere speculation or the building of one inference upon another." *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Plaintiff has failed to provide any credible evidence, aside from his own words, for a reasonable jury to find that he was actually involved in winning the DOJ or NIH contracts. Therefore, as a matter of law, Plaintiff shall be precluded from seeking commissions on the DOJ and NIH contracts.

### F. Commissions on Contract Modifications Executed After His Departure from PBGS

Pitney Bowes further argues that Plaintiff cannot seek a commission on any contract or contract modifications executed after the Agreement terminated. Plaintiff contends that he is not seeking commissions for any contract executed after his employment with PBGS. Instead, Plaintiff believes that the calculation of his commissions should include not only the value of the contracts when they were awarded, but also the value of any future modifications added to the original contracts later on, even ones added after he had left PBGS in 2005. Plaintiff claims that Pitney Bowes failed to pay him commissions on a number of modifications made after he had left PBGS on contracts he helped to win during his employment.

Plaintiff has not provided any evidence to support his method of calculating commissions. Plaintiff claims that Pitney Bowes used his method to pay him commissions in the past. He points to the commissions he had earned on the MTESC contracts and modifications to show that the calculation of his commissions included modifications executed after October 2005. However, the same exhibit clearly shows that the dollar amount in the "Commission Value" column is the same as the amount in the "Base Value of Cost Proposal" column, instead

12

of including the value of the modifications in the "Option(s) Value" column. (*See* Doc. No. 40, Ex. A). The modification values of the MTESC contracts in the "Option(s) Value" column are not included in the "Commission Value" column. *Id.* The commission value is not a combination of the contract value at the time of signing and the modifications made later. Having reviewed the pleadings and the attached exhibits, the Court does not believe that the plaintiff is entitled to any commissions on contract modifications that were made after his employment terminated.

Therefore, as a matter of law, Plaintiff cannot seek commissions payments on any contract modifications made after the end of his employment in PBGS in 2005.

### G. CONCLUSION

For the reasons stated above, Pitney Bowes' Partial Motion for Summary Judgment is **GRANTED-in-PART** and **DENIED-in-PART**, with the result that summary judgment is denied as to Count IV (Negligent Misrepresentation), Count V (Intentional Misrepresentation), and Count VI (Tortious Interferences with Prospective Economic Advantage). In addition, Plaintiff is barred from claiming commissions for DOJ and NIH contracts as well as any contract modifications funded after Plaintiff's departure from PBGS in 2005. However, Plaintiff is allowed to argue for contract modification during the trial based on the theory of mutual mistake. The Court will schedule a telephonic status conference to discuss further proceedings in this case. An order consistent with this Memorandum will follow.

Date:   August 29, 2011                                                    /s/
                                                                 Alexander Williams, Jr.
                                                                 United States District Court